# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Pacheco*, 2013 IL App (4th) 110409

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIA S. PACHECO, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0409 |
| Filed | June 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant minor's convictions for multiple counts of first degree murder arising from the death of her uncle at the hands of defendant's boyfriend in the course of a robbery were upheld over her contentions that the automatic transfer provisions of the Juvenile Court Act violated the proportionate penalties clause, the prohibition against cruel and unusual punishment, and a juvenile's due process rights, and that her counsel was ineffective in failing to understand the felony murder rule, failing to impeach her boyfriend, failing to object to the leading questions posed to him, and failing to tender separate instructions for each murder count. |
| Decision Under Review | Appeal from the Circuit Court of Clark County, No. 10-CF-63; the Hon. Tracy W. Resch, Judge, presiding. |
| Judgment | Affirmed as modified; cause remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Jacqueline L. Bullard (argued),
all of State Appellate Defender's Office, of Springfield, for appellant.

Dennis E. Simonton, State's Attorney, of Marshall (Patrick Delfino,
Robert J. Biderman, and Anastacia R. Brooks (argued), all of State's
Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE POPE delivered the judgment of the court, with opinion.
Justice Holder White concurred in the judgment and opinion.
Justice Appleton dissented, with opinion.

**OPINION**

¶ 1      On January 14, 2011, a jury found defendant, Maria S. Pacheco (born June 26, 1994),
guilty of robbery (accountability), unlawful possession of a stolen vehicle, and first degree
murder (accountability). The trial court sentenced her to 30 years in prison for murder
pursuant to section 5-130(1)(c)(i) of the Juvenile Court Act of 1987 (Juvenile Court Act)
(705 ILCS 405/5-130(1)(c)(i) (West 2008)). Defendant appeals, arguing the following: (1)
the trial court erred in refusing to tender separate jury instructions for each charged count of
murder; (2) trial counsel provided ineffective assistance of counsel by (a) conceding her guilt
of felony murder based on his misapprehension of the felony murder rule, (b) failing to
impeach the State's star witness with text messages he sent to other women, and (c) failing
to object to the State improperly leading its star witness with questions about text messages
between the witness and defendant; (3) the automatic exclusion of 15- and 16-year-olds
charged with felony murder or murder by accountability from juvenile court, thereby
requiring the automatic application of an adult sentencing range, violates due process, the
eighth amendment to the United States Constitution, and the proportionate penalties clause
of the Illinois Constitution; (4) the mandatory application of truth in sentencing to minors
convicted of murder by accountability or felony murder violates the eighth amendment and
the proportionate penalties clause; and (5) defendant is entitled to additional sentence credit.
We affirm defendant's conviction but remand for the trial court to grant defendant additional
sentencing credit.

¶ 2                                    I. BACKGROUND

¶ 3      On July 15, 2010, the State charged defendant as an adult with three counts of first degree
murder based on her accountability for the death of her uncle, Arnulfo Pacheco. These three
counts were based on defendant's intent to kill (720 ILCS 5/9-1(a)(1) (West 2008)) (count

-2-

I), knowledge the acts would result in the victim's death (720 ILCS 5/9-1(a)(1) (West 2008)) (count II), and knowledge the acts would create a strong probability of the victim's death (720 ILCS 5/9-1(a)(2) (West 2008)) (count III), respectively.

¶ 4 On December 3, 2010, the State added a fourth count alleging first degree murder based on accountability (720 ILCS 5/9-1(a)(3) (West 2008)) (count IV), alleging defendant's accomplice, Jarrod Riley, intentionally struck Arnulfo Pacheco in the head with a hammer causing his death while defendant and Riley were committing a robbery.

¶ 5 On December 30, 2010, the State charged defendant with robbery based on accountability (720 ILCS 5/18-1 (West 2008)) (count V), alleging she knowingly took $500 from the victim by the use of force. The State also charged defendant with unlawful possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2008)) (count VI).

¶ 6 On January 11, 2011, defendant's trial commenced. After the State laid out its case in its opening argument, defense counsel made his opening statement, stating in part:

"We believe the evidence will show that all this young girl wanted was to run away with her fiancé. She did not intend to have her uncle killed. She did not know he would be killed. In fact, did not know he was killed until after she came downstairs. Arnulfo Pacheco was killed only because Jarrod Riley lost control in his jealous rage and she wasn't present.

We think the evidence will show she may be guilty of some other things, such as Possession of the Stolen Vehicle, but the evidence will not show that she's guilty in any way of Murder, and we would ask you to find her not guilty of that offense."

¶ 7 The State's first witness was Dr. Roland Kohr. Dr. Kohr testified he performed an autopsy on the body of Arnulfo Pacheco and found the cause of death was "[b]lunt force injuries to the head combined with sharp forced injury to the neck and head, with extenuating hemorrhage."

¶ 8 Illinois State Police crime scene investigator Daniel Glover testified he collected a hammer and a piece of glass with sharp edges from the house where Arnulfo Pacheco was found. Investigator Glover also testified he collected a broken videocassette recorder (VCR) located near the victim's body.

¶ 9 Investigator Alex Latimer of the Camden police department in Camden, Tennessee, testified he received information from the Illinois State Police on July 16, 2010, a couple wanted for murder might be in his area. Latimer was given the names and physical description of the couple and a vehicle description for a 2005 Chevy Avalanche with Illinois registration. Latimer testified he located the vehicle at approximately 4 p.m. Latimer then took defendant and Riley into custody.

¶ 10 Illinois State Police special agent Holly Stroud-Finney testified she was the lead agent in the investigation in this case. She traveled to Tennessee after defendant and Riley were arrested and interviewed both of them. Before the interviews, she had obtained from Verizon text messages defendant and Riley sent each other between July 5, 2010, and July 13, 2010. As the lead agent in the investigation, Stroud-Finney knew how the victim died and knew duct tape had been wrapped around the victim's face and neck and bleach had been found at the residence. Information contained in the text messages matched evidence found at the

crime scene. On cross-examination, Stroud-Finney acknowledged the information she received from Verizon only disclosed the phone numbers from which the text messages were sent and not who actually sent the messages.

¶ 11 Jarrod Riley was then called for the limited purpose of establishing the contents of the text messages the investigators had received from Verizon. Riley testified he and defendant communicated via text message. Riley testified People's exhibit No. 410A-R accurately contained the text messages exchanged between him and defendant during the seven-day period in question. Riley testified he sent the text messages from his phone. He also testified defendant was protective of her phone so that no one else could use it.

¶ 12 Defense counsel challenged the admission of the text messages, arguing inadequate foundation and the messages constituted hearsay. The court admitted the text messages into evidence, finding they were "sufficiently authenticated by circumstantial evidence such as appearance, contents, substance, internal patterns and other distinctive characteristics." The court told the jurors they were not to assume the text message conversations were actually conducted by defendant and Riley, but they should make their own determination who authored the messages.

¶ 13 Riley testified he and defendant started dating in the spring of 2010 and began having a sexual relationship. He was 20, and defendant was 15. He stated defendant was the first girl he loved. In June 2010, defendant had her sixteenth birthday. Defendant told Riley she thought her uncle, Arnulfo, was going to get her a car for her birthday, but this did not happen. Riley testified defendant was not happy at home. She told him she always fought with her parents and hated her uncle. She said her father hit her and her mother. Riley testified defendant wanted to run away and he wanted to help her.

¶ 14 Riley testified he and defendant talked and texted about using bleach to knock out her uncle so they could take his car. He sent her a text message asking if she had rope or duct tape. She responded she thought there was some in the garage. Defendant later texted Riley to say they were out of duct tape, but she would buy some and keep looking for rope. Defendant suggested taking her father's checkbook with them to pay for things.

¶ 15 Riley texted defendant on July 10, 2010, and told her he wanted to leave on Monday. The texts showed the plan was for him to get to defendant's house, wait for her uncle to arrive, knock him out, tie him up, and take his car before he woke up. Defendant responded the plan sounded good. She said she would need to make sure she was home alone. Riley sent her another text and said she needed to soak a rag in bleach for Monday. Defendant confirmed she received the text message. Riley testified the rag and bleach were ultimately going to be used on Arnulfo.

¶ 16 Riley texted defendant and said he was going to take a cab to Marshall on Monday. Defendant replied her uncle would leave for work at 10 or 11 so Riley would need to get there earlier than that. Riley sent her a text message asking how they would get Arnulfo into her house. Riley testified he sent defendant another message telling her not to stop him no matter what he did to her uncle. She responded she would not stop him.

¶ 17 According to Riley's testimony, their plan later changed to killing Arnulfo and taking his truck. Riley testified on July 11, 2010, he sent defendant a text message stating they were

going to steal her uncle's "shit" after "i do what im doing to your uncle." He then sent defendant a text message which asked if defendant had any sharp knives at her house. Defendant responded shortly thereafter asking what Riley was planning to do. Riley sent her a text, stating he was going to " 'F' him up but if he fights back well you understand, righ." Defendant responded asking what Riley meant by " 'F' him up." She also said she did not think they needed to be "killing anyone yet."

¶ 18    Riley sent defendant a text message directing her to tell her uncle something was wrong with their toilet as a ruse to lure him into the house. He asked what time her uncle would be at her house. Defendant responded her uncle would be there around 10 a.m. before leaving for work. Riley sent defendant a text which said, "Then lets do this and be free and do unto ppl that has been done unto us." Riley said his intent was to kill defendant's uncle. Defendant responded texting "yes lets." Riley sent another text to defendant, which read, "I love you more than anything you might see a side of me tomorrow very few ppl see don't be scared cuz i would never hurt you." Riley sent defendant a message, texting, "I am already know what i am doing don't stop me soon you will have to be cold." Defendant responded, texting, "Huh." Riley texted her the following message, "Don't stop me no matter how it turns out."

¶ 19    Shortly thereafter, Riley asked defendant if she found bleach and a rag. Defendant replied she had. Riley also texted defendant asking whether she found a good strong knife. Defendant responded the knives she found were not that sharp or strong.

¶ 20    According to Riley, defendant told him her uncle inappropriately touched her by rubbing her inner thigh and lower back and kissing her on the cheek. Riley sent defendant a text, which read, "Was just going to knock him out but he is touching little girls and tried to touch my fiancé it ends tomorrow." Defendant replied, texting, "yea thats wat i thought you were planing to do."

¶ 21    Riley sent defendant another text, stating, "Lol i love you you are starting to sound and act like me thats good." Defendant responded, texting, "Lol I can be evil bad cruel sometimes lol." Riley replied, texting, "Be it more often just not to me ok baby it will help us in the future a lot." Riley sent defendant another message, texting, "Tomorrow we kill a bad man then we start our lives over just you and me." Defendant responded, texting, "Yes just you and me."

¶ 22    Riley later asked defendant if she had a baseball bat. Defendant said she did not. Defendant sent Riley a message, stating, "Have bunch of metal rods in garage tho." They texted about the size and strength of the rods. Riley sent defendant a message, texting, "I don't want them to break i want them to be strong im thinking just cutting his throat." Defendant responded, "They wont break. Do wat you need to do. All i ask is that i see none of it if possible." Defendant later texted Riley her uncle deserved "it," but she did not want to see "it."

¶ 23    Riley testified he texted defendant shortly after midnight on July 12, 2010, "Be happy are you sure you want this to still happen." He was talking about killing her uncle and running away. Defendant responded, "I am happy. Yes i'm sure that i want to do this."

¶ 24    Riley sent defendant a text the morning of July 12, 2010, asking if she was "ready for this baby." Defendant responded she was. As he was traveling to Marshall, Riley and defendant

exchanged text messages about her family's whereabouts. Riley went to defendant's house after her family left. Defendant got the bleach, and they moved a couch in front of the entryway to the kitchen. Riley put the bleach in a bowl and soaked the rag.

¶ 25     When defendant saw her uncle outside the house, she called to him from the kitchen window and said something was wrong with the bathroom. Defendant did not tell her uncle Riley was in the house. After Arnulfo checked on the bathroom, defendant pushed him at Riley. According to Riley, defendant told him to remember what her uncle had done to her. Riley grabbed Arnulfo by the throat and covered his mouth with the bleach-soaked rag. Although he could not see defendant at that time, he testified he could "tell she was there."

¶ 26     Riley testified the bleach did not knock Arnulfo out like he expected. Instead, Arnulfo tried to hit Riley with a hammer. Riley took the hammer from Arnulfo and hit him with it. The struggle between Riley and Arnulfo went from the foyer to the dining room of the home. Riley testified he did not know how many times he hit the victim with the hammer. Arnulfo was still struggling, and Riley hit him over the head with a VCR and then smashed a glass tabletop over his head. The glass tabletop broke, and Riley grabbed a piece of the glass and stabbed Arnulfo twice in his neck. Arnulfo stopped struggling at that point. Riley then taped the bleach-soaked rag over the victim's mouth with the duct tape defendant had brought into the house.

¶ 27     Riley testified Arnulfo was screaming defendant's name during the struggle, but she did nothing to aid him. After Riley taped the rag over Arnulfo's mouth, he saw defendant in the foyer, shaking. Riley asked if she was okay, and she said yes. Defendant went upstairs and grabbed her clothes and other things, which were already packed. She and Riley then started loading the victim's truck. They left the house within 5 to 10 minutes after Arnulfo was killed. After they got in Arnulfo's truck, defendant asked Riley if he got Arnulfo's wallet. He told her he did not. He testified defendant "gave me a look," and he went back in and got the wallet.

¶ 28     Riley testified defendant never tried to get away from him or call the police. They were arrested in Camden, Tennessee. According to Riley's testimony, while he and defendant were driving through Indiana, defendant told him she thought they should live a life of crime like Bonnie and Clyde, robbing and killing people.

¶ 29     On cross-examination, Riley testified he pled guilty to one count of first degree murder, one count of robbery, and one count of possession of a stolen vehicle. He had not yet been sentenced. Riley testified he did not have an agreement with the State's Attorney to receive anything for his testimony. However, Riley said his testimony could benefit him during sentencing. Riley acknowledged what he told investigators after his arrest differed from his testimony.

¶ 30     After his arrest, Riley told investigators his plan was to knock out or tie up Arnulfo and take his car. Riley admitted telling investigators he killed Arnulfo in a blind rage after the victim smiled at him. Riley also told investigators he was just joking around in the text messages before the murder. He admitted he did not originally tell investigators defendant pushed her uncle into him. Riley also acknowledged he did not get a knife or any other kind of weapon from the kitchen or anywhere else to use on Arnulfo, even though he testified his

intent before the attack was to kill the victim. The only thing Riley had when he grabbed Arnulfo was the rag soaked in bleach and the duct tape.

¶ 31    After Riley's testimony, the State recalled special agent Stroud-Finney. Stroud-Finney testified she traveled to Tennessee after defendant's arrest. That night, Stroud-Finney interviewed defendant at the Camden police department in Camden, Tennessee. The interview was video recorded. The video of the interview was played for the jury.

¶ 32    During the interview, defendant said she told Arnulfo something was wrong with the bathroom sink when he came to the house to return some dishes. She also admitted she was present when Riley initially grabbed Arnulfo and put the bleach-soaked rag over his mouth. She then ran outside, went around the house to the front door, reentered the home, saw Riley struggling with her uncle, and went upstairs to her bedroom. She could hear her uncle screaming at Riley and for the neighbors. She said she also heard Arnulfo screaming her name and heard things being thrown and breaking.

¶ 33    The struggle between Arnulfo and Riley lasted about five minutes. When she came downstairs and asked Riley what happened, Riley told her Arnulfo was dead. According to her interview, the original plan was not for Riley to kill her uncle, but only take his keys. However, during the struggle, Arnulfo asked Riley why he was doing this. Riley told Arnulfo he knew Arnulfo molested defendant, and Riley was going to take defendant away from Arnulfo. Arnulfo allegedly responded he could still molest defendant's sisters. This made Riley mad, and Riley killed Arnulfo.

¶ 34    Defendant admitted Riley told her prior to the day of the attack he might kill Arnulfo. She told the officers she was not afraid of Riley and went along with his plan willingly. She just did not want to see the actual murder. She told the officers she thought Arnulfo deserved what happened to him because he was a "bad person." When the officers asked defendant to describe the alleged molestation, defendant said Arnulfo rubbed her back on top of her clothes and tried to kiss her on the cheek. She also said Arnulfo never tried to do anything sexual or inappropriate to her. According to her statement, they would not have had to hurt Arnulfo if he had given her a car for her sixteenth birthday.

¶ 35    Defendant testified on her own behalf. She was 15 when she met Riley, who was 20, in the spring of 2010. The relationship became serious over the summer. At one point, she referred to him as her fiancé. Riley was her first boyfriend. She expressed frustration over her home life to Riley. In June 2010, Riley had to move from where he was living. At that time, he began talking about running away with defendant. When Arnulfo failed to give defendant a car for her birthday, Riley suggested they take her uncle's car. Riley told her he would use a bleach-soaked rag to make her uncle unconscious so they could take his car keys without hurting him. Defendant was scared because she did not know what Riley would do to her and her sisters if he was willing to do that to her uncle. She did not think anyone but Riley cared for her at that time.

¶ 36    Defendant admitted she made arrangements to get duct tape to use on her uncle. She testified Riley told her many times he had everything figured out and asked her to trust him. Defendant testified she did trust him. She thought the plan was just to run away. According to defendant, she thought Riley might beat up her uncle, not kill him. With regard to her

responses to Riley's text messages about killing her uncle, defendant testified both she was not responding to Riley's comments about killing her uncle and she was just joking around. She testified she did not think Riley was serious about killing her uncle. When Riley grabbed her uncle, she ran out the back door and then back in the front door. She saw Riley leading her uncle into the dining room. She went upstairs to her bedroom and heard a struggle downstairs. It eventually became quiet in the house. She came downstairs and saw blood in the hallway and dining room. Riley told her not to come any closer and to get her stuff together and put it in the truck, which she did.

¶ 37    Defendant denied sending Riley back into the house to get her uncle's wallet. She also denied pushing her uncle into Riley or telling him to remember what her uncle had done to her. She also denied telling Riley they should live a life of crime. According to her testimony, defendant thought the plan was only to tie Arnulfo up and take his vehicle.

¶ 38    On cross-examination, defendant admitted helping steal her uncle's truck, although she said it was Riley's plan. She also admitted letting Riley into the house, buying duct tape to be used to tape her uncle to a chair, and tricking her uncle into coming into the house. On redirect, defendant testified she thought Riley was just going to make her uncle unconscious and then take his stuff.

¶ 39    At the end of his closing argument on defendant's behalf, counsel made the following plea for the jury to take pity on defendant:

"Well, what we have here with [defendant] is a young, quiet girl. A young girl who thought she was in love and she made bad decisions. She trusted and relied on Jarrod Riley. She believed his promises and the things that he was telling her that were going to happen. She continued to believe the plan was going to get carried out just as they had set forth to begin with, which was a plan to restrain Arnulfo and to take his truck.

There was no intent to kill by her or by either of them at the start of the day on July 12th. There was no intent to kill by her. There was no expectation or anticipation of killing by her. It was anticipated he would be secured. She's guilty of some things, we acknowledge that, she's guilty of possession of the stolen vehicle, perhaps she's even guilty of robbery, but she's not guilty of murder.

We're asking you not to compound this tragedy to the Pacheco family by finding her guilty of a crime she did not commit. We're asking you to find her not guilty of murder. Thank you."

The jury found defendant guilty of unlawful possession of a stolen vehicle, robbery (accountability), and first degree murder (accountability).

¶ 40    On March 8, 2011, defendant filed a motion for a new trial, contending the trial court erred in allowing text messages to be presented to the jury because the messages were hearsay and were not properly authenticated; the court erred by allowing the use of a general verdict form rather than separate verdict forms for each alleged count of murder; and the State did not present sufficient evidence to prove defendant guilty of first degree murder. The court denied the motion.

¶ 41    On March 22, 2011, the trial court sentenced defendant to 30 years in prison with 3 years of mandatory supervised release (MSR) and credit for 239 days served. In sentencing

defendant, the court took into account her age and stated the evidence would suggest her potential for rehabilitation is greater than that of most juveniles who might find themselves in similar circumstances. The court noted defendant would serve 100% of the sentence.

¶ 42		The trial court stated the text messages and defendant's conduct left no reasonable doubt defendant knowingly planned, aided, and abetted in the murder of Arnulfo. According to the court:

> "On the day of the crime she laid the groundwork for the murder, first by inviting and encouraging Jarrod Riley to come to Marshall by cab from Terre Haute, and secondly, by asking Arnulfo Pacheco into her family's home on the pretext of a plumbing problem. Her invitation set him up for Jarrod Riley's attack."

The court found nothing in the circumstances of the offense suggested defendant had second thoughts or attempted to withdraw from the planned murder. The court stated:

> "Although Maria Pacheco is guilty by reason of accountability only, nonetheless, it must be observed that she was deeply and actively involved in the murder. She was personally present during the commission of the murder, which was premeditated and planned. The victim was the Defendant's uncle and the murder was committed so the codefendants might take the victim's vehicle and property."

The court also noted defendant supplied Riley with implements to use in the attack and by encouraging Riley to attack her uncle. The court stated:

> "She actively furthered the murder. Her participation was essential to the commission of the murder, and the murder would not have occurred but for her encouragement of Jarrod Riley and her participation in its planning and execution."

On April 4, 2011, defendant filed a motion to reconsider sentence, which was later denied.

¶ 43		This appeal followed.


¶ 44                              II. ANALYSIS

¶ 45		We choose not to address defendant's arguments in the order in which they are raised in her appellate brief. Instead, we will first address the constitutional arguments she raises. Second, we will address her arguments regarding the effectiveness of her trial counsel. Then, we will address defendant's argument regarding the verdict forms. Finally, we will address her argument she was not provided all the sentencing credit she deserved.


¶ 46                          A. Constitutional Arguments

¶ 47		Section 5-130(1)(a)(i) of the Juvenile Court Act (705 ILCS 405/5-130(1)(a)(i) (West 2008)) (automatic transfer statute), provides "[t]he definition of delinquent minor under Section 5-120 of this Article shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with *** first degree murder." Defendant was tried as an adult pursuant to this section of the Juvenile Court Act. Pursuant to section 5-130(1)(c)(i) of the Juvenile Court Act (705 ILCS 405/5-130(1)(c)(i) (West 2008)), the trial court had "available any or all dispositions prescribed for that offense under Chapter V of the Unified Code of Corrections [(Unified Code)]." Section 5-4.5-20(a) of the Unified Code

(730 ILCS 5/5-4.5-20(a) (West 2008)) provides the sentencing range for murder is 20 to 60 years of imprisonment. As a result, defendant was subject to a minimum 20-year prison sentence without the trial court being able to consider defendant's age or culpability. Further, section 3-6-3(a)(2)(i) of the Unified Code (730 ILCS 5/3-6-3(a)(2)(i) (West 2008)) provides such a sentence may not be reduced through good-conduct credit. Defendant argues these statutes both individually and when applied together are unconstitutional for a variety of reasons.

¶ 48        We presume statutes are constitutional. *People v. Miller*, 202 Ill. 2d 328, 335, 781 N.E.2d 300, 305 (2002). As a result, a defendant challenging the constitutionality of a statute must establish its constitutional invalidity. *Miller*, 202 Ill. 2d at 335, 781 N.E.2d at 305. In *Miller*, our supreme court noted:

> "We have repeatedly recognized that the legislature has discretion to prescribe penalties for defined offenses. [Citation.] The legislature's discretion necessarily includes the power to prescribe mandatory sentences, even if these mandatory sentences restrict the judiciary's discretion in imposing sentences. [Citation.] However, the power to impose sentences is not without limitation; the penalty must satisfy constitutional constrictions." *Miller*, 202 Ill. 2d at 336, 781 N.E.2d at 306.

¶ 49        Defendant's argument is primarily based on three recent United States Supreme Court decisions. See *Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010); *Miller v. Alabama*, 567 U.S.___, 132 S. Ct. 2455 (2012). In *Roper*, the Supreme Court held the eighth amendment bars capital punishment for juvenile offenders. *Roper*, 543 U.S. at 568. According to the Court, "[b]ecause the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." *Roper*, 543 U.S. at 568. In *Graham*, the Court held a sentence of life without the possibility of parole violates the eighth amendment when imposed on juvenile offenders for crimes other than homicide. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2034. The Court stated although "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life," "[i]t does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030. In *Miller*, the Court held the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," even those convicted of homicide offenses. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. According to the Court, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶ 50        These three decisions dealt with the two most severe forms of punishment allowed under the United States Constitution, *i.e.*, the death penalty and life imprisonment without the possibility of parole. However, defendant argues the reasoning behind these three opinions should not be limited to sentences of death and life without the possibility of parole. Relying on the following quote from *Graham*, "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed" (*Graham*, 560 U.S. at ___, 130 S. Ct. at 2031), defendant essentially argues any jurisdictional or sentencing statute that automatically treats a juvenile

the same as an adult is unconstitutional. With regard to this particular case, defendant argues the automatic transfer of juveniles is unconstitutional, the automatic imposition of an adult sentence on these juveniles is unconstitutional, and the juveniles' automatic inability to receive good-conduct credit is also unconstitutional.

¶ 51    We disagree with defendant's expansive reading of this single sentence. As we stated earlier, the Supreme Court in *Roper*, *Graham*, and *Miller* was only concerned with the death penalty and life without the possibility of parole, which are the two most severe punishments allowed under the United States Constitution. We agree with the State "[i]t would be a great stretch to say that *Graham* meant to require legislatures and courts to treat youths and adults differently in every respect and every step of the criminal process." As we have covered this topic in a broad manner, we now look at defendant's specific arguments.

¶ 52                    1. *Eighth Amendment and Proportionate Penalties Clause*

¶ 53                            a. Automatic Transfer Statute

¶ 54    Defendant first argues section 5-130 of the Juvenile Court Act (705 ILCS 405/5-130 (West 2008)) violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because it automatically requires the transfer of certain juvenile defendants into adult court. The eighth amendment to the United States Constitution (U.S. Const., amend. VIII) prohibits the imposition of cruel and unusual punishment. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The proportionate penalties clause has been read as coextensive with the eighth amendment. *In re Rodney H.*, 223 Ill. 2d 510, 518, 861 N.E.2d 623, 628 (2006).

¶ 55    We do not find the automatic transfer statute violates either the eighth amendment or the proportionate penalties clause of the Illinois Constitution. In *People v. Salas*, 2011 IL App (1st) 091880, ¶ 66, 961 N.E.2d 831, the First District found the automatic transfer statute "does not impose any punishment on the juvenile defendant, but rather it only provides a mechanism for determining where defendant's case is to be tried." Since the statute does not impose any punishment, the First District found it was not subject to the eighth amendment. *Salas*, 2011 IL App (1st) 091880, ¶ 66, 961 N.E.2d 831; see also *People v. Jackson*, 2012 IL App (1st) 100398, ¶¶ 23-24, 965 N.E.2d 623. We agree with the First District's reasoning.

¶ 56                        b. Automatic Imposition of Adult Sentence

¶ 57    Defendant next argues the automatic imposition of any adult sentence on a juvenile defendant as a result of the automatic transfer statute violates the eighth amendment and the proportionate penalties clause. As stated earlier, when taken to its logical extreme, defendant's argument would make any statute unconstitutional which imposes on a juvenile transferred to adult court the same mandatory minimum sentence applicable to an adult for the same offense. We disagree.

¶ 58    Defendant reads *Roper*, *Graham*, and *Miller* too broadly. The Supreme Court did not

-11-

hold in *Roper*, *Graham*, or *Miller* the eighth amendment prohibits a juvenile defendant from being subject to the same mandatory minimum sentence as an adult, unless the mandatory minimum sentence was death or life in prison without the possibility of parole. Defendant was sentenced to neither of these. The minimum 20-year term defendant faced in this case does not compare with the death penalty or a mandatory term of life in prison without the possibility of parole. The sentencing range applicable to defendant in this case is not unconstitutional pursuant to *Roper*, *Graham*, and *Miller*, and the sentence defendant received violated neither the eighth amendment nor the proportionate penalties clause.

¶ 59                                  c. Truth in Sentencing

¶ 60     Defendant next argues "[w]hether considered alone or in combination with the excluded jurisdiction scheme ***, the automatic application of truth-in-sentencing to minors convicted of murder by accountability or felony murder by accountability violates the eighth amendment to the U.S. Constitution and the proportionate penalties clause of the Illinois Constitution." For the same reasons we do not find the automatic exclusion statute or the imposition of the sentencing ranges applicable to adults violates either the eighth amendment or the proportionate penalties clause, we do not find the application of the truth-in-sentencing statute unconstitutional in this case.

¶ 61                                  2. *Due Process Clauses*

¶ 62     Defendant contends Illinois's excluded jurisdiction scheme violates the due process clauses of both the United States Constitution (U.S. Const., amends. V, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, § 2) because a trial court cannot make an individualized determination whether a minor should be transferred to criminal court and subject to adult sentencing requirements. The due process clauses contained in both the United States and Illinois Constitutions prohibit the government from depriving any individual of "life, liberty or property, without due process of law." U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2.

¶ 63     Illinois courts have found the automatic transfer statute does not violate a juvenile offender's substantive and procedural due process rights. See *People v. J.S.*, 103 Ill. 2d 395, 402-05, 469 N.E.2d 1090, 1094-95 (1984); *People v. Patterson*, 2012 IL App (1st) 101573, ¶ 27, 975 N.E.2d 1127; *People v. Croom*, 2012 IL App (4th) 100932, ¶¶ 13-18, 975 N.E.2d 1107; *Jackson*, 2012 IL App (1st) 100398, ¶¶ 13-17, 965 N.E.2d 623; *Salas*, 2011 IL App (1st) 091880, ¶¶ 75-79, 961 N.E.2d 831; *People v. Reed*, 125 Ill. App. 3d 319, 322-25, 465 N.E.2d 1040, 1042-44 (1984). In *Croom*, 2012 IL App (4th) 100932, ¶ 16, 975 N.E.2d 1107, this court noted *Roper* and *Graham* did not consider due process arguments and found those cases distinguishable because each "applied (1) a different analysis (2) under a different test for (3) an alleged violation of a different constitutional provision regarding severe sentencing sanctions—not the automatic transfer to adult court at issue here." *Miller* does not require a different result because it only dealt with eighth-amendment arguments and not substantive and procedural due process.

¶ 64     In addition, we note the trial court here took into account defendant's youth. The court

also considered the extent of defendant's participation in aiding and abetting Arnulfo's murder, noting he would not have been killed but for defendant's complicity in the crime. Moreover, the court imposed a 30-year sentence, 10 years more than the minimum available sentence, after considering the nature of the crime and the factors in mitigation. This is clearly not a case where the trial judge felt unduly constrained by the options available to him with respect to the sentencing minimums.

¶ 65     As our supreme court's opinion in *J.S.* remains good law and defendant fails to persuade the eighth amendment analysis in *Miller* should be applied to her due process arguments, her claim the automatic transfer statute is unconstitutional is without merit.

¶ 66     3. *Policy*

¶ 67     We agree with the dissent's observation not all juvenile offenders are the same. We also agree with the dissent the blanket transfer to adult criminal court of all juveniles of a certain age charged with certain offenses may not be good policy. However, we cannot find a statute unconstitutional simply because we believe it creates bad policy. "In relation to the judicial branch, the General Assembly, which speaks through the passage of legislation, occupies a superior position in determining public policy." *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168, 175, 720 N.E.2d 1052, 1057 (1999).

¶ 68     It is clear the United States Supreme Court in *Roper*, *Graham*, and *Miller* has provided juveniles with more constitutional protection than adults. However, we disagree these decisions make the statutes previously discussed unconstitutional. Further, we recognize our supreme court in *Miller* stated it has never defined what kind of punishment constitutes cruel or degrading punishment or is so disproportionate to the offense that it shocks the moral sense of the community. *Miller*, 202 Ill. 2d at 339, 781 N.E.2d at 307-08. Our supreme court noted "[t]his is so because, as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Miller*, 202 Ill. 2d at 339, 781 N.E.2d at 308. It may be time for our supreme court to consider this important issue. However, based on the arguments made by defendant and the prior precedent of both this court and, more importantly, our supreme court, defendant has failed to overcome the strong presumption the statutes at issue in this case are constitutional.

¶ 69     B. Effectiveness of Trial Counsel

¶ 70     We next address defendant's argument her trial attorney's representation was constitutionally deficient because he conceded her guilt of felony murder based on his misapprehension of the felony murder rule. Defendant argues trial counsel was also ineffective by failing (1) to impeach Riley with available text message records where he was communicating with other women and (2) to object to the State's improper use of leading questions during its examination of Riley.

¶ 71     To hold an attorney's representation constitutionally ineffective, we must first determine an attorney made errors so serious he was not functioning as counsel guaranteed by the sixth amendment to the United States Constitution. We must then also conclude defendant was prejudiced by those errors. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The

attorney's actions must be judged in the context of the entire trial. A defendant must overcome the presumption the actions criticized could be considered sound trial strategies under the circumstances of the case. *Strickland*, 466 U.S. at 689.

¶ 72                                    1. *Attorney's Concessions*

¶ 73       We first address defendant's argument her trial counsel was ineffective because of the concessions he made with regard to her guilt for possession of a stolen vehicle and robbery. According to defendant, because the murder was committed during the course of the robbery, her attorney, by conceding she was probably guilty of robbery, also conceded her guilt of felony murder because of his "fundamental misunderstanding" of the felony murder rule.

¶ 74       She argues when a defendant exercises her constitutional right to plead not guilty and chooses to have a jury trial, her attorney is obliged to develop a trial strategy consistent with her plea, holding the State to its heavy burden of proof. *People v. Chandler*, 129 Ill. 2d 233, 244-45, 543 N.E.2d 1290, 1294-95 (1989). In *Chandler*, our supreme court stated a defendant's trial counsel cannot concede a client's guilt to the jury unless the record affirmatively shows the attorney did so based on a legitimate trial strategy and with the client's knowing consent. *Chandler*, 129 Ill. 2d at 244-45, 543 N.E.2d at 1294-95. Further, the supreme court stated it is not a legitimate trial strategy to concede a client's guilt based on a hope the jury will ignore the jury instructions it has sworn to follow and acquit a defendant out of sympathy. *Chandler*, 129 Ill. 2d at 248, 543 N.E.2d at 1296.

¶ 75       We do not find the record supports defendant's argument her counsel did not understand the felony murder rule. In addition, based on the overwhelming evidence in this case, it is difficult to conceive of a legitimate trial strategy counsel could have implemented on defendant's behalf other than the one he attempted.

¶ 76       The evidence against defendant was overwhelming. The State had numerous text messages from defendant to Riley detailing what they were going to do to Arnulfo, how they were going to do it, and what they were going to do afterward. The State also had Riley's cooperation. Riley had entered a guilty plea and was a witness for the State. Riley detailed defendant's involvement in the planning and commission of the crimes in question and her actions after Arnulfo's death. In addition, the State had a videotaped interview of defendant confessing her involvement in the crimes.

¶ 77       We also find defendant's reliance on *Chandler* is misplaced. Unlike in *Chandler*, defendant in the case *sub judice* decided to testify on her own behalf. She essentially conceded her guilt to robbery and possession of a stolen vehicle in front of the jury. We are not going to reverse a defendant's conviction based on a concession made by her attorney when she essentially made the same concessions in her own testimony.

¶ 78       It appears defense counsel's strategy was simple—try to keep defendant's incarceration to a minimum. Considering the State's evidence and his own client's testimony, it appears defense counsel determined the best chance of accomplishing this strategy was to concede the obvious in the hopes the jury would believe defendant did not know Riley intended to kill Arnulfo. Regardless of the legal validity of the argument, this was defendant's best chance at acquittal on the murder charges.

¶ 79    Unlike *Chandler*, the situation in this case is closer to that faced by our supreme court in *People v. Shatner*, 174 Ill. 2d 133, 673 N.E.2d 258 (1996). In *Shatner*, the supreme court distinguished its decision in *Chandler*, stating claims of ineffective assistance must be reviewed on a case-by-case basis and decided on the reasonableness of counsel's conduct based on the facts of the particular case at the time of the conduct in question. *Shatner*, 174 Ill. 2d at 147, 673 N.E.2d at 264. Our supreme court noted the finding of ineffectiveness in *Chandler* was not based solely on the defendant's alleged failure to develop a theory of innocence. *Shatner*, 174 Ill. 2d at 147, 673 N.E.2d at 264. The court pointed out in *Chandler* it "observed that the defense counsel's performance was deficient because he failed to cross-examine several key prosecution witnesses; cross-examined others in an extremely conclusory manner; and called no witnesses to testify, including defendant, even though counsel had asserted that defendant would do so during opening argument." *Shatner*, 174 Ill. 2d at 147, 673 N.E.2d at 264.

¶ 80    The supreme court contrasted the actions of the defense attorney in *Shatner*, finding counsel "aggressively cross-examined" nearly every prosecution witness and called witnesses on defendant's behalf to attempt to discredit the State's witnesses and bolster defendant's credibility. The court noted:

> "Ultimately, it was the defendant's own statements, both to the FBI and on the witness stand, and not the actions or strategy of his counsel, which undermined any claim of innocence that defendant may have had. If a defendant enters a not-guilty plea in the face of overwhelming evidence of his guilt, we are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant's behalf. To do so would effectively require defense attorneys to engage in fabrication or subterfuge." *Shatner*, 174 Ill. 2d at 148, 673 N.E.2d at 264.

The court noted defense counsel tried to minimize his client's admitted involvement in the robbery scheme and shift the blame for both the murder and robbery onto another person who voluntarily accompanied the defendant to the crime scene. Defense counsel "aggressively attacked the credibility of [this other person] and portrayed her as a calculating cocaine addict who seduced defendant into assisting her in a robbery during which she killed the victim." *Shatner*, 174 Ill. 2d at 148, 673 N.E.2d at 265. The court stated:

> "It is apparent that defense counsel sought to convince the jury that defendant's minimal involvement in the scheme warranted either a finding of innocence or a conviction for robbery only. While this strategy was risky, it was strategy nonetheless, and perhaps the only strategy which could have been seriously pursued given defendant's admissible incriminating statements and the overwhelming evidence of his guilt. Defendant now contends that his trial counsel should have presented a reasonable doubt theory, *i.e.*, defendant played no role whatsoever in the crime which [the other person] perpetrated. However, it is arguable that that strategy would have been even less credible and less likely to succeed than the one his attorney actually pursued. Under the circumstances of this case, defense counsel's performance was not deficient with respect to his proffered defense theory." *Shatner*, 174 Ill. 2d at 148, 673 N.E.2d at 265.

¶ 81    The same reasoning applies to the facts in this case. While defense counsel's strategy was

risky and ultimately failed, it was still strategy. Defense counsel did his best to procure the jury's sympathy for defendant. In so doing, he vigorously cross-examined Riley in an attempt to show defendant did not know Riley planned to murder Arnulfo. Given defendant's testimony, it was the only reasonable strategy defense counsel could have seriously pursued.

¶ 82                                    2. *Impeachment With Text Messages*

¶ 83       Riley testified he initially lied to investigators to protect defendant because he loved her. Defendant contends her counsel was ineffective for failing to impeach Riley with text messages he sent other women. However, defendant was not prejudiced by her attorney's omission. The evidence against defendant was overwhelming. Defense counsel thoroughly cross-examined Riley regarding the discrepancies between his initial statement to the police and his trial testimony. The text messages Riley sent to other women simply would not have affected the jury's verdict.

¶ 84       Defendant also argues counsel was ineffective by failing to object to the leading nature of the State's direct examination of Riley with regard to the text messages. Over 2,000 pages of text messages were sent between Riley and defendant. Riley's testimony was used to lay the foundation for their admission. By objecting to the leading nature of the State's questions, defense counsel would run the risk of appearing obstructionist to the jury, especially here where it was a certainty the text messages were going to be admitted. Failure to object to the leading nature of the questions constitutes trial strategy, which is generally not subject to a claim of ineffective assistance of counsel. *People v. Pecoraro*, 144 Ill. 2d 1, 13, 578 N.E.2d 942, 947 (1991). Moreover, because of the overwhelming evidence against defendant, including her own testimony, defendant cannot establish she was prejudiced when counsel failed to object to these leading questions. Had defense counsel objected, the State would have simply rephrased the questions. Defendant fails to show the jury would not have learned the substance of the text messages.

¶ 85                                         C. Verdict Forms

¶ 86       We next address defendant's argument the trial court erred in refusing to tender separate jury instructions for each count of murder as charged. According to defendant, her attorney requested separate verdict forms for each theory of murder (*i.e.*, knowing, intentional, strong probability, and felony murder), in case a question arose on appeal as to the counts on which the jury had found defendant guilty. In the trial court, the State argued the jury should only receive a general verdict form. The trial court agreed. The trial court later denied defendant's motion for a new trial based on the lack of separate verdict forms.

¶ 87       Defendant cites *People v. Smith*, 233 Ill. 2d 1, 15, 906 N.E.2d 529, 537 (2009), for the proposition a trial court has no discretion to deny a request for separate verdict forms when a defendant is charged with knowing, intentional, strong probability, and felony murder based on the alleged murder of a single person when one of the counts could have more favorable consequences for the defendant. According to defendant, if the trial court refuses such a request, the general verdict form on appeal must be treated as a verdict on the count which most benefits defendant. See *Smith*, 233 Ill. 2d at 28, 906 N.E.2d at 544-45.

¶ 88    Defendant argues she was prejudiced by the trial court's error because "the question of whether the jury would have found her guilty of felony murder alone affects three arguments on appeal." According to defendant's brief:

> "Argument IV asserts that the automatic application of truth-in-sentencing to minors who are convicted of felony murder by accountability violates the eighth amendment, and Argument III asserts that the automatic application of an adult sentencing range to such minors is unconstitutional. Prevailing on either of these arguments could subject [defendant] to less onerous sentencing provisions. The denial of separate verdict forms also undermines [defendant's] ability to establish prejudice from trial counsel's concession of guilt on the felony murder count, as set forth in Argument II. Having fought the tendering of separate verdict forms below, the State should not be allowed to benefit from the uncertainty created by their position on appeal. Thus, this court should assume for purposes of [defendant's] arguments on appeal that the jury verdict in this case was for felony murder."

See *Smith*, 233 Ill. 2d at 9, 25, 906 N.E.2d at 534, 542-43. Regardless of whether the trial court erred on this issue, based on our holdings on the other issues, defendant cannot establish she was prejudiced by the verdict form used in this case.

¶ 89                               D. Sentence Credit

¶ 90    Defendant also argues she should have received an additional six days of sentencing credit for time spent in custody in Tennessee between July 16 and 21, 2010. See 730 ILCS 5/5-4.5-100(b) (West 2010). The trial court only gave defendant credit for the period between July 22, 2010, and March 17, 2011. The State concedes defendant is entitled to credit for these six days. The State points out an arrest warrant was issued in Illinois on July 15, 2010, for the offense of first degree murder. We accept the State's concession. Detention in another state is to be credited against a defendant's sentence if the detention in the other state is a result of the offense for which the defendant is sentenced. *People v. Elder*, 392 Ill. App. 3d 133, 138, 910 N.E.2d 202, 206 (2009).

¶ 91                               III. CONCLUSION

¶ 92    For the reasons stated, we affirm the trial court's judgment as modified: the sentence is to be modified to give defendant presentence custody credit from July 16, 2010, to March 17, 2011. Otherwise, the sentence remains unaltered. We direct the trial court to amend the sentencing order accordingly. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 93    Affirmed as modified; cause remanded with directions.

¶ 94    JUSTICE APPLETON, dissenting.

¶ 95    I respectfully dissent from the majority's decision. While the majority disposition is well reasoned and consistent with existing statutory provisions, I find the mandatory transfer of 15-

and 16-year-old juveniles to adult court is violative of the analysis set forth in *Miller v. Alabama*, 567 U.S. \_\_\_, 132 S. Ct. 2455 (2012). I agree that many juveniles in the 15- to 16-year-old age group charged with a felony offense rightly deserve to have their crimes adjudicated as if they were, chronologically, adults. However, it is beyond peradventure that not all juveniles are the same. Each 15- or 16-year-old evinces a maturity based, not on chronological age, but rather on his or her young life experiences, development, and familial influences.

¶ 96     In *Miller*, the Supreme Court looked to two of its decisions: *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010), which concluded that the eighth amendment forbade the imposition of a death sentence on a juvenile (*Roper*, 543 U.S. at 574) and, subsequently, a sentence of life imprisonment without parole on a juvenile who had not committed homicide (*Graham*, 560 U.S. at \_\_\_, 130 S. Ct. at 2034).

¶ 97     The Supreme Court said in *Miller*, 567 U.S. at \_\_\_, 132 S. Ct. at 2458:

"*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. \*\*\*

\* \* \*

\*\*\* [Any life-without-parole sentence imposed on a juvenile] contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."

¶ 98     I find that these cases pose serious constitutional risks to the viability of Illinois's mandatory transfer of juvenile offenders to adult court and, consequently, to adult prison sentences. While there are juvenile offenders who may, based on the totality of the circumstances, be eligible for adult prosecution, an automatic transfer provision based on age and offense alone, without consideration of the wide variance in the maturity, sophistication, intelligence, and social adjustment of any particular juvenile offender, cannot pass constitutional muster. I would argue that the circumstances of the case before us stand as an example of the fallacy of the mandatory transfer of *all* juveniles aged 15 and 16 to adult court, which under the reasoning of *Roper* and *Miller* cannot stand.

¶ 99     To be sure, our legislature recognized the increase in violent, homicidal crime committed by juvenile offenders and sought to address that problem. I believe it is the *blanket* transfer based on age that is the flaw in the legislature's response. Such decisions are better made on the circumstances of the offender as well as the offense. In that sense, we should look to both the crime and the nature of the criminal.

¶ 100    Maria Pacheco was a good student working at her family's restaurant until, at age 15, she met and fell in what she believed was love with the 20-year-old codefendant, Riley. It would appear that her nuclear family was a close one. Riley's provenance is unknown, but we do know he had left several foster homes and was living in some sort of a group home. Riley engaged in a sexual relationship with Maria (a crime in and of itself). Maria was apparently so smitten that she was willing to leave her family and run away with Riley. In order to garner the funds necessary for their elopement, an agreement was made to rob Maria's uncle. While there was some evidence that Maria was disturbed by the uncle's touching her and her

younger sister, the degree of that unwanted contact is unknown.

¶ 101      To be sure, Maria helped plan the assault, obtained the necessary blunt instruments for the assault on the victim, and engineered Riley's entrance into the house. Because of that participation, there is no doubt that Maria is guilty of felony murder. However, it is no stretch to compare the service as a lookout on the part of Kuntrell Jackson in the comparison case of *Miller* to the assistance rendered by defendant here. The only other evidence of Maria's *actual* participation in the assault on the victim was Riley's testimony that he "sensed" Maria's presence during the assault. Maria denied being present in the room where the assault occurred.

¶ 102      I find that, under the reasoning of *Miller* and *Graham*, the mandatory transfer of 15- and 16-year-old juveniles to adult court is constitutionally prohibited. I would reverse the conviction of defendant and require the trial court to make an individualized assessment of defendant's capacity and culpability with regard to the genesis, planning, and commission of the instant offense.