MANSFIELD, Justice
(dissenting).
I respectfully dissent. The sentence in this case is a harsh one. Its severity results from a combination of two things: (1) the general assembly’s decision to require persons who commit first-degree robbery to serve seventeen and one-half years in *100 prison (or seventy percent of their twenty-five-year sentence) before being eligible for parole; and (2) the district court’s decision to “box car” (or run consecutively) the two first-degree robbery sentences in this case.
The severity of this sentence is only partly related to the defendant’s age. This sentence would have been harsh even if the defendant had been legally an adult, rather than just seventeen years and three months old, at the time she went on this crime spree with her eighteen-year-old boyfriend.
Needless to say, I am not a member of the general assembly, nor am I the trial judge. I do not get to decide the proper sentence in this case. In addition, the defendant has not argued that the district court abused its sentencing discretion.[8]
Thus, the only question before us is whether the sentence violates the United States or Iowa Constitution because it is “cruel and unusual.” For the reasons stated herein, I agree with the court of appeals that the sentence is not so “grossly disproportionate” as to render it unconstitutional. See State v. Oliver, 812 N.W.2d 636, 650-51 (Iowa 2012) (citation and internal quotation marks omitted).
I. Some Key Facts.
The majority has accurately described the facts of this case. However, I would like to emphasize a few points.
The guns wielded by Pearson and her boyfriend Lukinich during the robberies appeared to be real handguns to the victims and initially to the police. Only later when the police picked the guns up did they learn the guns were C02 powered BB guns.
The first robbery victim described a terrifying scene. He opened the door; Pearson pointed one of the guns at him and told him he was being robbed. Lukinich then pointed his own gun at the victim and said, “If she don’t shoot you, I will.” The victim was forced to lie down on the floor while Pearson and Lukinich rummaged through the house and grabbed numerous items.
The main victim of the second robbery turned out to be an elderly woman. While getting ready for bed, she heard noises in the night and went downstairs with her walker. She was confronted by Pearson and Lukinich, both wielding what appeared to be handguns. She yelled for her son who lived with her. As soon as she called out, Lukinich pushed her against the wall, causing her shoulder to fracture in several places. Pearson and Lukinich then left the house with a shotgun, cash, and prescription medicine they had taken.
Both of these victims submitted written victim impact statements, which were read by the victim coordinator at sentencing. The first victim stated, “I truly believe that they [Pearson and Lukinich] should both remain behind bars for the extent of my life and theirs.” The second victim asked that each of the defendants be imprisoned for fifty years. The State requested consecutive sentences for each defendant on the two robberies.
The presentence investigation does not indicate that Pearson came from a troubled family background. Into her high school years, she lived at home with her *101 parents, who had been married for the past twenty-three years. Her father was disabled and stayed at home during the day; her mother had been working for the same employer for the past twelve and one-half years. According to Pearson’s juvenile court officer, “There are no concerns of them trying to cover up their daughter’s negative behaviors. They are very concerned for Desirae’s well being.”
Pearson’s juvenile record dates back to elementary school.[9] When she was fourteen, Pearson was expelled from her local high school for a serious assault on another female student. She received juvenile court services and a year later was allowed to return to that school. The following year, when Pearson was nearly sixteen, she was discharged from juvenile court services. She also began attending the alternative high school, which she was still attending at the time of her and Lukinich’s crime spree. There are indications that Pearson regularly used marijuana and possibly alcohol and prescription drugs.
After Pearson was convicted of the two robberies (and two burglaries) arising out of these home invasions, and while she was awaiting sentencing, she wrote two letters to the judge. In the first letter, she confessed her crimes and requested “a lesser sentence than what I am facing.” However, just before sentencing, Pearson sent the court another, shorter letter in which she asked not to go to prison, i.e., “a second chance to live life other than behind bars.”
The district court certainly was aware of Pearson’s youth. In fact, Pearson’s attorney briefed and argued Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), had not yet been decided. He urged that juveniles are “less deserving of the most severe punishments ... more capable of change and less likely to show evidence of irretrievably depraved character than adults.” He added that a juvenile offender “must have some meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation.” He concluded, “[T]he fact that juveniles tend to make immature decisions should influence the Court to sentence Miss Pearson to the minimum possible, which is still in my opinion a very large sentence of 25 years.”
The district court commented on what it perceived to be Pearson’s “troubled” family life and history, and “very negative influences” on her. It noted that efforts by the juvenile court system to rehabilitate her had apparently been unsuccessful. It also indicated that it did not believe Graham was applicable because “we are not discussing a life sentence for Miss Pearson.” Ultimately, the court decided to make the robbery/burglary sentences for the second home invasion consecutive to the robbery/burglary sentences for the first home invasion. The district court commented, “I don’t believe that the focus here today should be on the rehabilitation of the defendants, but rather the protection of society in these particular cases.” It also pointed out the seriousness of the injuries to the second victim.
II. Because This Case Does Not Involve a Sentence of Life Without Parole (LWOP). or Its Practical Equivalent, Graham and Miller Do Not Apply.
As I’ve already indicated, I carry no particular brief for the sentence Pearson *102 received in this case. Although it does not exceed what the State and the two main victims requested, it is longer than I would have imposed. But the district court is surely right: It is not a life sentence.
Any fair reading of Graham and Miller requires us to acknowledge this point. In Graham, the Court held that “for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.” 560 U.S. at -, 130 S.Ct. at 2030, 176 L.Ed.2d at 845 (“This Court now holds_”). The Court went on:
A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.
Id. at -, 130 S.Ct. at 2030, 176 L.Ed.2d at 845-46. The Court made clear that it was establishing a “categorical rule.” Id. at -, 130 S.Ct. at 2032, 176 L.Ed.2d at 848. But of course, Pearson falls outside the category. She will be eligible for parole when she is in her early fifties. She has a “meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.” Id. at -, 130 S.Ct. at 2030, 176 L.Ed.2d at 846.
In Miller, the Court decided that “the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.” 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424 (“We therefore hold.... ”). The Court added that “[i]n imposing a State’s harshest penalties, a sentencer misses too much if he treats every child as an adult.” Id. at -, 132 S.Ct. at 2468, 183 L.Ed.2d at 422-23. “Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features.... ” Id. at -, 132 S.Ct. at 2468, 183 L.Ed.2d at 423. But Miller does not cover Pearson’s circumstances either. She did not receive “a State’s harshest penalt[y],” nor was her penalty “mandatory.”
In short, Graham and Miller have a lot to say about youth and immaturity, much of which would be obvious anyway to an experienced Iowa trial judge. But they have nothing to say about this case, because it does not involve an actual or de facto life sentence. The observations about juvenile offenders in Graham and Miller are there only to justify restricting the most severe form of imprisonment— life without parole — for these offenders.
The majority here rewrites those cases. Yet it does not manage even to be consistent with today’s decision in State v. Null, 836 N.W.2d 41, 2013 WL 4250939 (Iowa 2013). In Null, the majority found that a sentence of 52.5 years before eligibility for parole fell under Graham and Miller because the mere “prospect of geriatric release” was insufficient. 836 N.W.2d at 71. Here, without adding much to what it said in Null, the court concludes that a sentence of thirty-five years before eligibility for parole falls under Graham and Miller. Pearson would be eligible for parole when in her early fifties, so the problem here is not “geriatric release,” but that Pearson has been deprived of “the possibility of leading a more normal adult life.” Thus, we now have two standards for when Graham and Miller apply. And for good measure, the majority fires a shot across the bow: “We have no occasion to consider whether Miller’s principles must be applied to all juvenile sentences.” The first question a trial judge or attorney might ask in the next juvenile offender case is, ‘Where does the law stand?”
Regardless of the outer limits of the majority’s rulings, it is clear the court has *103 now transformed Miller and Graham into a platform to potentially overturn hundreds of non-LWOP prison sentences imposed on juvenile offenders in Iowa. This would be unprecedented. While some jurisdictions have concluded that Graham and Miller apply to “de facto” life sentences where the defendant will not be eligible for parole until she is at or approaching her life expectancy, no other appellate court has adopted the majority’s reading of those cases. The Iowa Supreme Court stands alone.[10]
For example, recently the Illinois Court of Appeals was confronted with a challenge to a lengthy prison sentence for a sixteen-year-old girl who had aided and abetted her twenty-year-old boyfriend in murdering an uncle who had molested her. People v. Pacheco, 372 Ill.Dec. 406, 408-09, 991 N.E.2d 896, 898-99 (Ill.App.Ct.2013). The mandatory minimum was twenty years; the trial court sentenced the defendant to thirty years in prison. Id. at 413-14, 417-18, 991 N.E.2d at 903-04, 907-08. The court had little difficulty in concluding that the Supreme Court’s line of cases was inapplicable. Id. at 408-09, 416-17, 991 N.E.2d at 898-99, 906-07.[11]
In People v. Perez, the California Court of Appeal recently rejected a Graham/Miller challenge to consecutive mandatory minimum sentences for forcible lewd acts committed when the defendant was sixteen years old. 214 Cal.App.4th 49, 154 Cal.Rptr.3d 114, 115, 118-21 (2013). Under the overall sentence, the defendant would not be eligible for parole for thirty years, when he would be forty-seven years old. Id. at 120. Still, the court had no difficulty upholding the sentence because “[t]he central focus in the majority opinions [of the United States Supreme Court] was the fact the offenders had been exposed to the ‘harshest’ available sentence.” Id. at 120-21. As the court put it, “[T]his is not an LWOP case. The state’s most severe pen *104 alties are not at stake here.” Id. at 121. The court added, “There is a bright line between LWOPs and long sentences with eligibility for parole if there is some meaningful life expectancy left when the offender becomes eligible for parole.” Id. at 119.
As the Colorado Court of Appeals recently stated:
Lehmkuhl has cited no post-Graham decision, nor have we found one, that has determined that a sentence affording a defendant a chance to be paroled within his natural lifetime violates Graham’s requirement that defendants be given a meaningful opportunity to obtain release.
People v. Lehmkuhl, — P.3d -, -, 2013 WL 3584754, at *3 (Colo.App.2013).
We can now look forward to a flurry of new proceedings as the State, defense attorneys, and our own judicial system sort through the unresolved issues raised by the majority opinion. For example, if a sentence of thirty-five years without parole implicates G'raham and Miller, as my colleagues believe, then the current sentencing law governing juveniles who commit class “A” nonhomicide felonies would appear to be in constitutional jeopardy. That law was enacted by the legislature in 2011 in response to Graham. See 2011 Iowa Acts ch. 131, § 147 (codified at Iowa Code § 902.1(2) (Supp.2011)). It provides that any juvenile who commits a Class “A” felony other than first-degree murder shall automatically receive a life sentence but shall be eligible for parole “after serving a minimum term of confinement of twenty-five years.” Id. Certainly, a twenty-five year mandatory term of imprisonment would prevent the offender from “living a more normal adult life.” If so, my colleagues seemingly have doomed one of our legislature’s enactments.[12]
We can get a good sense of how many new proceedings this decision could generate by looking at data from the Division of Criminal and Juvenile Justice Planning within the Iowa Department of Human Rights. According to these data, as of May 31, 2013, there were 425 inmates serving time in Iowa prisons for offenses committed before the age of eighteen. See Iowa Dep’t of Human Rights, Div. of Criminal & Juvenile Justice Planning, Current Inmates Under 18 at Time of Offense (May 31, 2013), available at http://www. humanrights.iowa.gov/cjjp/images/pdf/ Prison_Population_Juveniles_05312013.pdf. Only thirty-six of these individuals had committed Class “A” felonies. Id. Thus, the vast majority of these individuals are serving prison terms of various lengths but not LWOP terms. Thanks to the current decision, they may now have a ticket to court and a potential resentencing.[13]
Of course, a court should not refrain from rendering a decision because it may have far-reaching effects. But before we kick start a process that could overturn approximately 400 prison sentences, and put ourselves at odds with every other state and federal appellate interpretation of Graham and Miller, we owe it to the public to explain clearly what we are doing and why the law requires it. The majority opinion falls short.[14]
*105 The majority is unable to improve upon its scant reasoning in Null. Again and again, Miller made clear that it was addressing life without parole sentences, described variously as “the most serious penalties,” “the most severe punishments,” “the harshest sentences,” the “most severe penalties,” “the law’s harshest term of imprisonment,” “this ultimate penalty for juveniles,” “this lengthiest possible incarceration,” “a sentence of life (and death) in prison,” “a State’s harshest penalties,” “that harshest prison sentence,” “this harshest possible penalty,” and “the harshest possible penalty.” See 567 U.S. at -, 132 S.Ct. at 2460, 2464-69, 2475, 183 L.Ed.2d at 414, 418-22, 424, 430. My colleagues simply ignore this limiting language, which the United States Supreme Court was careful to use throughout its opinion.
To be sure, the majority includes the same escape hatch as in Null — namely, that it is applying the principles of Miller under article I, section 17 of the Iowa Constitution. While this may protect the majority from having its reasoning reviewed by the United States Supreme Court, it fails to explain why all other state courts to apply the same principles have reached a different conclusion. As noted, one of the central principles of Miller is that it applies only to the most severe penalties. .Miller did not constitutionalize every sentencing proceeding whereby a juvenile is sent to prison.
The concurrence in this case, while intended to bolster the majority opinion, only exposes its flaws. In a backhanded way, the concurrence expresses the view that Miller applies to all “lesser crimes”— not merely “lengthy” prison sentences or “consecutive mandatory minimum” sentences. Thus, the concurrence says,
[Djenying juveniles who commit lesser crimes the protections afforded in Miller, denies them their rights under the Eighth Amendment and article I, section 17 no less than denying a juvenile who commits a considerably more serious crime the very same protections.
But if “denying” Miller to a juvenile who commits a lesser crime violates the Eighth Amendment and article I, section 17, then Miller must apply to all juveniles who commit crimes. In any event, this novel and even broader interpretation of Miller only adds to the uncertainty engendered by the majority opinions in this case and Null. If the justices joining the majority in these two decisions cannot agree on what they stand for, how are the bench and bar to follow them?[15]
*106 Also, the concurrence speaks of our “rapidly evolving” approach to juvenile justice and the “changing landscape of juvenile justice.” I agree with these observations but draw a different conclusion from them. Elected officials are better situated than a state supreme court to reflect rapid developments and changing landscapes. Our court can only resolve particular cases that are brought to us. When we decide a case, we are limited to the record made by the parties before us; we do not have the benefit of input from other Iowans. And when we render a constitutional decision, as here, that effectively freezes the status quo until the next decision.[16]
Appellate judges do not have a monopoly on understanding the problems of youth. The average Iowan surely knows that juveniles are generally less “culpable” than adults. And the complex juvenile justice system that our elected representatives have enacted reflects this. See Iowa Code ch. 232 (2013).
Our duty as judges is to leave it to the legislature to determine both crimes and the range of punishments; “culpability” is basically their call. We are authorized to step in only in the rare case, such as mandatory LWOP for juvenile offenders, where the punishment is “cruel and unusual.”
III. The Defendant’s Sentence Is Not Unconstitutional Under Brueg-ger/Oliver.
This then leads to the question whether the sentence is unconstitutional under the proportionality analysis set forth in State v. Bruegger, 773 N.W.2d 862 (Iowa 2009), and Oliver, 812 N.W.2d 636. Pearson is not making a categorical challenge, only an as-applied one.[17] This is a close call for me.
We first must decide whether the sentence is “grossly disproportionate” to the crimes. If the sentence does not create an inference of gross disproportionality, no further inquiry is necessary. Oliver, 812 N.W.2d at 650. “Our principal task at this stage is to ‘balane[e] the gravity of the crime against the severity of the sentence.’ ” Id. (quoting Bruegger, 773 N.W.2d at 873). “[I]t is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review.” Id.
Although it is a close question, I am unable to reach the conclusion that the sentence is so grossly disproportionate to the crimes committed as to be unconstitu *107 tional under Oliver and Bruegger. Pearson was an active participant in two separate home invasions with guns. While the guns were BB guns, the victims did not know that and the situation easily could have escalated into a deadly scenario. One person suffered a significant injury. Although Pearson did not personally inflict the injury, she was an active participant in both robberies — wielding a gun, confronting the victims, and carrying off items from the homes. Additionally, while Pearson was a juvenile at the time of the crimes, she was close to legal adulthood at the age of seventeen years and three months old. Also, though the record indicates that Pearson had problems with as-saultive behavior and anger management as a juvenile, these crimes were not anger-driven. In one of her letters to the court, Pearson admitted that she and Lukinich shoplifted at two stores and unsuccessfully tried to break into one home before committing the two robberies/burglaries here.
I agree with the court of appeals: “Certainly arguments can be made that the seventy percent mandatory minimum is longer than our society finds acceptable....” State v. Pearson, No. 11-1214, 2012 WL 3194101, at *4 n. 3 (Iowa Ct.App. Aug. 8, 2012). I also agree with the court of appeals: “but the prerogative to make such a change lies with our legislature [i.e., society’s elected representatives].” Id.
IY. Unresolved Questions.
I do not address the separate question, not raised on appeal, whether the consecutive sentences were an abuse of sentencing discretion by the district court. See, e.g., State v. August, 589 N.W.2d 740, 745-46 (Iowa 1999) (finding no abuse of discretion in the imposition of consecutive sentences). This is a serious question for me. I also do not address any other matters not raised on appeal. I would simply hold that the Eighth Amendment and article I, section 17 have not been violated.
WATERMAN and ZAGER, JJ., join this dissent.

. Another serious issue, not raised by Pearson on appeal, but touched upon in some of the correspondence with the district court, is that Pearson is African-American. Twenty-five percent of Iowa’s prison population is African-American, as compared to 2.9% in the general population. Iowa Dep't of Human Rights, Div. of Criminal & Juvenile Justice Planning, Iowa Prison Population Forecast FY 2011-2021 (2011), at 29, available at http:// www.humanrights.iowa.gov/cjjp/images/pdf/ Forecast201 l.pdf. This is due in large part to the number of African-Americans serving "70 percent” sentences. Id. at 2.

. As noted by the majority, Pearson’s parents believed that her behavior changed after she was hit by a car when she six or seven years old and hospitalized for several days. However, the University of Iowa hospitals ran both neurological and psychiatric exams that did not detect anything amiss.

. In addition to the discussion here, I refer the reader to the out-of-state cases cited in part II of my dissent in Null.

. The court explained:
[T]he Supreme Court in Roper [v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)], Graham, and Miller was only concerned with the death penalty and life without the possibility of parole, which are the two most severe punishments allowed under the United States Constitution. We agree with the State "[i]t would be a great stretch to say that Graham meant to require legislatures and courts to treat youths and adults differently in every respect and every step of the criminal process.” As we have covered this topic in a broad manner, we now look at defendant’s specific arguments.
[[Image here]]
Defendant next argues the automatic imposition of any adult sentence on a juvenile defendant as a result of the automatic transfer statute violates the eighth amendment and the proportionate penalties clause. As stated earlier, when taken to its logical extreme, defendant’s argument would make any statute unconstitutional which imposes on a juvenile transferred to adult court the same mandatory minimum sentence applicable to an adult for the same offense. We disagree.
Defendant reads Roper, Graham, and Miller too broadly. The Supreme Court did not hold in Roper, Graham, or Miller the eighth amendment prohibits a juvenile defendant from being subject to the same mandatory minimum sentence as an adult, unless the mandatory minimum sentence was death or life in prison without the possibility of parole. Defendant was sentenced to neither of these. The minimum 20-year term defendant faced in this case does not compare with the death penalty or a mandatory term of life in prison without the possibility of parole. The sentencing range applicable to defendant in this case is not unconstitutional pursuant to Roper, Graham, and Miller, and the sentence defendant received violated neither the eighth amendment nor the proportionate penalties clause.
Pacheco, 372 Ill.Dec. at 416-17, 991 N.E.2d at 906-07.

.• The majority does not respond to the substance of this argument. Instead, in Null, citing yet another law review article, the majority dismisses it as a "slippery-slope-type argument.” I believe the implications of a judicial decision are a fair topic for discussion.

. Some of these persons may have received term-of-years sentences that amount to de fac-to life sentences, as arguably occurred in Null, but I suspect that is not a large group.

. The majority tries to defend itself from the charge that it has muddied the waters by including a footnote in Null that muddies the waters even more. Thus, the majority points *105 out that Miller does not achieve ‘'certainty” because it does not foreclose LWOP. True enough, but irrelevant. The issue is not whether the law is "certain” in some absolute sense; that is unattainable. The issue is whether my colleagues have created more uncertainty by eliminating the bright-line rule in Miller that limits its application to LWOP sentences.

. The concurrence says it would be "illogical” to limit Miller to the harshest penalties and cites Chief Justice Roberts’s dissent in Miller for that point. But Chief Justice Roberts was making that point by way of criticizing the Miller decision as fundamentally wrong. See Miller, 567 U.S. at-, 132 S.Ct. at 2482, 183 L.Ed.2d at 437-38 (Roberts, C.J., dissenting). The Miller majority clearly indicated that a combination of two factors was necessary to render a punishment cruel and unusual: a crime committed by a youth and a sentence of life without parole. A reading of the case that focuses on youth alone rather than youth plus the harshest penalty is simply not faithful to the Supreme Court’s opinion. That is why no other court has adopted it. In the words of the California Court of Appeal;
[N]o high court has articulated a rule that all minors who commit adult crimes and who would otherwise be sentenced as adults must have the opportunity for some discretionary reduction in their sentence by the trial court to account for their youth. *106 Perez’s sentence, albeit long, still leaves plenty of time for him to be eligible for parole. It passes constitutional muster.
Perez, 154 Cal.Rptr.3d at 121.

. After indicating that Miller applies to lesser crimes, the concurrence seemingly pulls back and says that the majority opinion “is limited to the bizarre facts of this case.” I do not see any such fact-based limitation in the majority’s opinion. The concurrence further describes the majority opinion as a "modest, incremental step.” I do not believe those words fairly describe an opinion that significantly departs from just-decided United States Supreme Court precedents and that may overturn many existing prison sentences.

. As she puts it:
There is no argument that individuals convicted of robbery in the first degree should not be sentenced to an indeterminate term of imprisonment not to exceed twenty-five years[,] that the court can run various sentences as concurrent or consecutive sentences or that, in most instances involving adult offenders, a mandatory minimum sentence of seventy percent is cruel or unusual_ As stated above, defendant here asserts that the imposition of the seventy percent mandatory minimum sentence under section 902.12, particularly when applied in consecutive terms of imprisonment, is a violation of the cruel and unusual punishment prohibitions as that prohibition is applied to this defendant in this specific instance.