NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180211-U

NO. 4-18-0211

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 18, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Clark County |
| MARIA S. PACHECO, | ) | No. 10CF63 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Tracy W. Resch, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding defendant received reasonable assistance of postconviction counsel.

¶ 2    In June 2017, defendant, Maria S. Pacheco, filed a *pro se* postconviction petition. In September 2017, the State filed a motion to dismiss, arguing defendant's actual innocence claim failed and her other arguments were *res judicata*. In March 2018, the trial court dismissed defendant's postconviction petition.

¶ 3    Defendant appeals, arguing she received unreasonable assistance of postconviction counsel where counsel failed to shape her sentencing claim into proper legal form. For the following reasons, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5            In July 2010, the State charged defendant, who was 16 years old at the time of the

offense, as an adult with three counts of first-degree murder based on her accountability for the

death of her uncle, Arnulfo Pacheco (720 ILCS 5/9-1(a)(1), (2) (West 2010)).  The State also

charged defendant with robbery based on a theory of accountability (720 ILCS 5/18-1 (West

2008)) and possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2010)).  In June 2011,

the matter proceeded to a jury trial.  In defendant's direct appeal, this court summarized the

relevant testimony from defendant's codefendant, Jarrod Riley, as follows:

          "Riley testified he and defendant started dating in the

     spring of 2010 and began having a sexual relationship.  He was 20,

     and defendant was 15.  He stated defendant was the first girl he

     loved.  In June 2010, defendant had her sixteenth birthday.

     Defendant told Riley she thought her uncle, Arnulfo, was going to

     get her a car for her birthday, but this did not happen.  Riley

     testified defendant was not happy at home.  She told him she

     always fought with her parents and hated her uncle.  She said her

     father hit her and her mother.  Riley testified defendant wanted to

     run away and he wanted to help her.

          Riley testified he and defendant talked and texted about

     using bleach to knock out her uncle so they could take his car.  He

     sent her a text message asking if she had rope or duct tape.  She

     responded she thought there was some in the garage.  Defendant

     later texted Riley to say they were out of duct tape, but she would

- 2 -

buy some and keep looking for rope. Defendant suggested taking her father's checkbook with them to pay for things.

Riley texted defendant on July 10, 2010 and told her he wanted to leave on Monday. The texts showed the plan was for him to get to defendant's house, wait for her uncle to arrive, knock him out, tie him up, and take his car before he woke up. Defendant responded the plan sounded good. She said she would need to make sure she was home alone. Riley sent her another text and said she needed to soak a rag in bleach for Monday. Defendant confirmed she received the text message. Riley testified the rag and bleach were ultimately going to be used on Arnulfo.

Riley texted defendant and said he was going to take a cab to Marshall on Monday. Defendant replied her uncle would leave for work at 10 or 11 so Riley would need to get there earlier than that. Riley sent her a text message asking how they would get Arnulfo into her house. Riley testified he sent defendant another message telling her not to stop him no matter what he did to her uncle. She responded she would not stop him.

According to Riley's testimony, their plan later changed to killing Arnulfo and taking his truck. Riley testified on July 11, 2010, he sent defendant a text message stating they were going to steal her uncle's 'shit' after 'i do what im doing to your uncle.' He then sent defendant a text message which asked if defendant had

- 3 -

any sharp knives at her house. Defendant responded shortly thereafter asking what Riley was planning to do. Riley sent her a text, stating he was going to " 'F' him up but if he fights back well you understand, righ." Defendant responded asking what Riley meant by " 'F' him up." She also said she did not think they needed to be 'killing anyone yet.'

Riley sent defendant a text message directing her to tell her uncle something was wrong with their toilet as a ruse to lure him into the house. He asked what time her uncle would be at her house. Defendant responded her uncle would be there around 10 a.m. before leaving for work. Riley sent defendant a text which said, 'Then lets do this and be free and do unto ppl that has been done unto us.' Riley said his intent was to kill defendant's uncle. Defendant responded texting 'yes lets.' Riley sent another text to defendant, which read, 'I love you more than anything you might see a side of me tomorrow very few ppl see don't be scared cuz i would never hurt you.' Riley sent defendant a message, texting, 'I am already know what i am doing don't stop me soon you will have to be cold.' Defendant responded, texting, 'Huh.' Riley texted her the following message, 'Don't stop me no matter how it turns out.'

Shortly thereafter, Riley asked defendant if she found bleach and a rag. Defendant replied she had. Riley also texted

defendant asking whether she found a good strong knife. Defendant responded the knives she found were not that sharp or strong.

According to Riley, defendant told him her uncle inappropriately touched her by rubbing her inner thigh and lower back and kissing her on the cheek. Riley sent defendant a text, which read, 'Was just going to knock him out but he is touching little girls and tried to touch my fiancé it ends tomorrow.' Defendant replied, texting, 'yea thats wat i thought you were planing to do.'

Riley sent defendant another text, stating, 'Lol i love you you are starting to sound and act like me thats good.' Defendant responded, texting, 'Lol I can be evil bad cruel sometimes lol.' Riley replied, texting, 'Be it more often just not to me ok baby it will help us in the future a lot.' Riley sent defendant another message, texting, 'Tomorrow we kill a bad man then we start our lives over just you and me.' Defendant responded, texting, 'Yes just you and me.'

Riley later asked defendant if she had a baseball bat. Defendant said she did not. Defendant sent Riley a message, stating, 'Have bunch of metal rods in garage tho.' They texted about the size and strength of the rods. Riley sent defendant a message, texting, 'I don't want them to break i want them to be

- 5 -

strong im thinking just cutting his throat.' Defendant responded, 'They wont break. Do wat you need to do. All i ask is that i see none of it if possible.' Defendant later texted Riley her uncle deserved 'it,' but she did not want to see 'it.'

Riley testified he texted defendant shortly after midnight on July 12, 2010, 'Be happy are you sure you want this to still happen.' He was talking about killing her uncle and running away. Defendant responded, 'I am happy. Yes i'm sure that i want to do this.'

Riley sent defendant a text the morning of July 12, 2010, asking if she was 'ready for this baby.' Defendant responded she was. As he was traveling to Marshall, Riley and defendant exchanged text messages about her family's whereabouts. Riley went to defendant's house after her family left. Defendant got the bleach, and they moved a couch in front of the entryway to the kitchen. Riley put the bleach in a bowl and soaked the rag.

When defendant saw her uncle outside the house, she called to him from the kitchen window and said something was wrong with the bathroom. Defendant did not tell her uncle Riley was in the house. After Arnulfo checked on the bathroom, defendant pushed him at Riley. According to Riley, defendant told him to remember what her uncle had done to her. Riley grabbed Arnulfo by the throat and covered his mouth with the bleach-soaked rag.

Although he could not see defendant at that time, he testified he could 'tell she was there.'

Riley testified the bleach did not knock Arnulfo out like he expected. Instead, Arnulfo tried to hit Riley with a hammer. Riley took the hammer from Arnulfo and hit him with it. The struggle between Riley and Arnulfo went from the foyer to the dining room of the home. Riley testified he did not know how many times he hit the victim with the hammer. Arnulfo was still struggling, and Riley hit him over the head with a VCR and then smashed a glass tabletop over his head. The glass tabletop broke, and Riley grabbed a piece of the glass and stabbed Arnulfo twice in his neck. Arnulfo stopped struggling at that point. Riley then taped the bleach-soaked rag over the victim's mouth with the duct tape defendant had brought into the house.

Riley testified Arnulfo was screaming defendant's name during the struggle, but she did nothing to aid him. After Riley taped the rag over Arnulfo's mouth, he saw defendant in the foyer, shaking. Riley asked if she was okay, and she said yes. Defendant went upstairs and grabbed her clothes and other things, which were already packed. She and Riley then started loading the victim's truck. They left the house within 5 to 10 minutes after Arnulfo was killed. After they got in Arnulfo's truck, defendant asked Riley if he got Arnulfo's wallet. He told her he did not. He

testified defendant 'gave me a look,' and he went back in and got the wallet.

Riley testified defendant never tried to get away from him or call the police. They were arrested in Camden, Tennessee. According to Riley's testimony, while he and defendant were driving through Indiana, defendant told him she thought they should live a life of crime like Bonnie and Clyde, robbing and killing people." *People v. Pacheco*, 2013 IL App (4th) 110409, ¶¶ 13-28, 991 N.E.2d 896.

¶ 6 Following the June 2011 trial, the jury convicted defendant of robbery by accountability, unlawful possession of a stolen vehicle, and first-degree murder by accountability.

¶ 7 In March 2011, the trial court held a sentencing hearing. The State argued defendant actively participated in Riley's plan to murder Arnulfo and admitted Arnulfo would not be dead if she had not lured him into the trap. The State argued defendant's young age was a mitigating factor, but it should not outweigh her participation in the premeditated murder of her uncle. The State recommended a sentence of 45 years' imprisonment.

¶ 8 Defense counsel argued a minimum sentence of 20 years' imprisonment was appropriate. Defense counsel argued defendant was only 15 years old when she met Riley and they decided to run away. Defendant was young and unsophisticated at the time of Arnulfo's murder and would not have been involved in such an event without Riley planning and executing the murder. Counsel argued that normally defendant would have been prosecuted in juvenile court because "it's accepted that 15 and 16-year-olds do not always make rational decisions and

- 8 -

are driven by immature decision making." Counsel acknowledged the legislature determined the age for criminal prosecution should be lower for first-degree murder but "[t]hat does not change the fact that 15 and 16-year-olds do not think and act rationally as adults."

¶ 9        The trial court began by noting the sentencing hearing was under Article 5 of the Unified Code of Corrections (730 ILCS 5/5-5-1 *et seq.* (West 2010)) and related only to the offense of first-degree murder. The court stated it "considered the presentence investigation report, the nature and circumstances of the offense, [defendant]'s statement in allocution, the evidence at trial, the arguments of counsel as to sentencing alternatives *** [and] each and every one of the statutory factors in aggravation and mitigation." The court noted the text messages between defendant and Riley left no reasonable doubt that defendant knowingly planned, aided, and abetted Arnulfo's murder. The court discussed numerous factors in mitigation and specifically addressed defendant's age as follows:

"Third, the [d]efendant's age. This relates probably to factors eight and nine, or at least possibly nine. [Defendant] turned 16 two weeks before the murder, approximately. No one can know how the actions of this juvenile were affected by her age and by the involvement of Jarrod Riley, who is an adult, even if an immature one.

The law acknowledges that juveniles are different than adults and presupposes that juveniles generally have a greater potential for rehabilitation. The evidence would suggest that [defendant]'s potential for rehabilitation is greater than that of most juveniles who probably find themselves in these

circumstances as a result of their participation in murder. By the time [defendant] is released from prison, she will be much older. It is unlikely that the circumstances in which this crime was committed will reoccur."

The court again stated it "considered the nature and circumstances of the offense and the history, character, age[,] and attitude of the [d]efendant," and sentenced defendant to 30 years' imprisonment.

¶ 10　　　　This court affirmed defendant's conviction and sentence on direct appeal. *People v. Pacheco*, 2013 IL App (4th) 110409, 991 N.E.2d 896.

¶ 11　　　　In June 2017, defendant filed a *pro se* postconviction petition. In her petition, defendant raised a claim of actual innocence, arguing text messages show she had no knowledge of Riley's plan to kill Arnulfo. Defendant further argued the State failed to prove the elements of first-degree murder. Defendant also alleged a violation of her eighth and fifth amendment rights (U.S. Const., amends. VIII, V). Specifically, defendant alleged the three-year term of mandatory supervised release violated her constitutional rights because it extended her sentence beyond the maximum term of imprisonment to be served at 100%. Finally, defendant alleged she received ineffective assistance of trial counsel where counsel failed to seek a psychological evaluation as to her mental capacity. Defendant alleged "she was afraid of her codefendant whom was legally an adult who was in a sexual relationship with a minor, and manipulat[ed] her youth and mind[,] creating and facilitating the actions of this minor." Defendant alleged trial counsel provided ineffective assistance for failing to (1) provide that information during trial and (2) get defendant "psychological testing before trial in this regard."

¶ 12        In January 2018, appointed counsel filed a motion to request appointment of a

psychiatrist to evaluate defendant to determine if Riley's control over her would have negated

the offense, assisted in defendant's defense, or provided mitigation evidence at sentencing.

During the hearing on the motion, appointed counsel asserted she would file an amended

postconviction petition if a psychiatric evaluation helped defendant in any way. The trial court

denied the motion to appoint an expert.

¶ 13        In February 2018, appointed counsel filed a certificate pursuant to Illinois

Supreme Court Rule 651(c) (eff. July 1, 2017), asserting:

> "(1) I have consulted with the [d]efendant by mail to
>
> ascertain the defendant's contentions of error in her *pro se*
>
> [p]etition for [c]onviction [r]elief.
>
>         (2) I have examined portions of the trial court file and
>
> partial report of the jury trial proceedings regarding the errors cited
>
> in the [d]efendant's *pro se* [p]etition for [p]ost [c]onviction [r]elief.
>
>         (3) Counsel does not intend to amend the defendant's
>
> [*p*]*ro se* [p]etition because she is unable to obtain supporting
>
> affidavits from a psychiatrist based on the [c]ourt's ruling on
>
> February 26, 2018."

In March 2018, the trial court dismissed defendant's postconviction petition.

¶ 14        This appeal followed.

¶ 15                                II. ANALYSIS

¶ 16        On appeal, defendant argues she received unreasonable assistance of

postconviction counsel where counsel failed to shape defendant's sentencing claim into proper

legal form. Specifically, defendant argues postconviction counsel should have amended the petition to argue the trial court failed to take defendant's age into account at sentencing in violation of the eighth amendment. The State asserts postconviction counsel was not required to formulate new claims and the *pro se* petition did not raise even a gist of a claim that the 30-year prison sentence violated the eighth amendment on account of defendant's age.

¶ 17 The Post-Conviction Hearing Act provides for the appointment of counsel at the second stage of proceedings. 725 ILCS 5/122-4 (West 2016). Appointed counsel must provide "reasonable assistance," including compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). *People v. Johnson*, 154 Ill. 2d 227, 237-38, 609 N.E.2d 304, 309 (1993). "Rule 651(c) requires that the record disclose that post-conviction trial counsel: (1) consulted with the petitioner to ascertain his contentions of constitutional deprivation; (2) examined the record of the proceeding of the original trial; and (3) made any amendments to the *pro se* petition necessary to adequately present the petitioner's constitutional contentions." *Id.* at 238. Appointed counsel is presumed to have provided defendant reasonable assistance of counsel when a Rule 651(c) certificate is filed. *People v. Mendoza*, 402 Ill. App. 3d 808, 813, 931 N.E.2d 703, 707-08 (2010).

¶ 18 Here, defendant contends counsel failed to provide reasonable assistance where she did not amend the postconviction petition to raise a claim that defendant's 30-year sentence violated the eighth amendment based on defendant's age. Defendant argues the trial court "openly rejected the central concepts that must underpin a juvenile sentence." Defendant asserts the trial court's rejection of these concepts resulted in an improper sentence. The State argues defendant's *pro se* postconviction petition did not raise a constitutional claim that her sentence

was improper because the trial court rejected the notion that being a juvenile could be taken into account during sentencing.

¶ 19     Defendant's postconviction petition raised a claim of actual innocence, arguing text messages showed she had no knowledge of Riley's plan to kill Arnulfo. Defendant further argued the State failed to prove the elements of first-degree murder. Defendant also alleged a violation of her eighth and fifth amendment rights. Specifically, defendant alleged the three-year term of mandatory supervised release violated her constitutional rights because it extended her sentence beyond the maximum term of imprisonment to be served at 100%. Finally, defendant alleged she received ineffective assistance of trial counsel where counsel failed to seek a psychological evaluation as to her mental capacity. Defendant alleged "she was afraid of her codefendant whom was legally an adult who was in a sexual relationship with a minor, and manipulat[ed] her youth and mind[,] creating and facilitating the actions of this minor." Defendant alleged trial counsel provided ineffective assistance for failing to (1) provide that information during trial and (2) get defendant "psychological testing before trial in this regard."

¶ 20     Nothing in defendant's *pro se* postconviction petition indicates a claim that her sentence was improper because the trial court explicitly refused to consider her age at sentencing. Defendant's only eighth amendment claim addressed the propriety of a three-year term of mandatory supervised release. Counsel's duty to amend a *pro se* postconviction petition is limited by the constitutional claims raised by defendant. *People v. Richardson*, 382 Ill. App. 3d 248, 258, 888 N.E.2d 553, 561 (2008). Postconviction counsel is not required to formulate new claims. *People v. Vasquez*, 356 Ill. App. 3d 420, 424-25, 824 N.E.2d 1071, 1076 (2005).

¶ 21     Even if counsel had raised the claim defendant raises on appeal, we conclude this eighth amendment claim is frivolous and patently without merit. *Miller v. Alabama*, 567 U.S.

460, 489 (2012), stands for the proposition that a court must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. A life sentence for a juvenile, whether mandatory or discretionary, is disproportionate and violates the eighth amendment unless the court considers the defendant's youth and its attendant characteristics. *People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849. Therefore, an eighth amendment claim exists where a juvenile (1) received a "life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *People v. Buffer*, 2019 IL 122327, ¶ 27, 137 N.E.3d 763. The Illinois Supreme Court has held that a 40-year term of imprisonment without parole eligibility is long enough to be considered a *de facto* life sentence. *Id.* ¶ 40.

¶ 22        Here, defendant did not receive a life sentence. Defendant was sentenced to a term of 30 years' imprisonment. The Illinois Supreme Court has established a bright-line rule that 40 years is a *de facto* life sentence. Obviously, defendant's sentence does not reach that threshold. Moreover, we find defendant mischaracterizes the record in this case. Defendant repeatedly asserts the trial court "openly rejected" the notion of taking defendant's youth into account. But the trial court expressly stated it found defendant's age to be a mitigating factor. The court stated, "No one can know how the actions of this juvenile were affected by her age and by the involvement of Jarrod Riley, who is an adult, even if an immature one." But the court went on to acknowledge the law recognizes juveniles are different from adults. A fair reading of the trial court's entire remarks on sentencing indicates the judge considered a wide range of factors and took into account defendant's age in mitigation. The complained-of comment that "no one can know how" defendant's actions were affected by her age is more fairly read as

indicating an inability to quantify defendant's age, not a refusal to consider her age.

Accordingly, we affirm the judgment of the trial court.

¶ 23                             III. CONCLUSION

¶ 24          For the reasons stated, we affirm the trial court's judgment.

¶ 25          Affirmed.